UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Docket No. 1:19-cr-00109-NT |
| | ) | |
| ANDRE MULLER and | ) | |
| ROBERT HOLLAND, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANT ANDRE MULLER'S MOTION TO DISMISS THE
INDICTMENT OR FOR A CHANGE OF VENUE**

Before me is a motion to dismiss the indictment or change the venue of the

trial, which was filed by Defendant Andre Muller and joined in by Defendant Robert

Holland (ECF No. 237). For the reasons addressed below, and as stated at the final

pretrial conference (ECF No. 248), the motion is DENIED.

**PROCEDURAL BACKGROUND**

Defendants Muller and Holland have each been charged with conspiracy to

interfere with commerce by robbery, a violation of the Hobbs Act, 18 U.S.C. § 1951(a).

Indictment (ECF No. 3). A trial was scheduled for jury selection on April 5, 2022, in

Bangor, Maine (ECF No. 155). On March 30, 2022, the Court provided the parties

with the names and supplemental questionnaires of the jurors who were summoned

to appear for jury selection (ECF No. 176). On April 2, 2022, Defendants Muller and

Holland filed motions for continuance of trial so that they might challenge the jury

selection process. Def. Andre Muller's Mot. for a Continuance of the Trial so that He

May Challenge the Jury Selection Process as in Violation of his Sixth Amendment

Rights, his Right to Due Process, his Right to Equal Protection and in Violation of the

Jury Selection and Service Act of 1968 ("**Mot. for Continuance**") (ECF No. 185);

Def. Holland's Mot. to Join Def. Muller's Mot. to Continue Filed at ECF # 185 (ECF

No. 186).[1] The Defendants asserted that the juror information provided by the Court

indicated that the jury selection process violated their constitutional and statutory

rights. Mot. for Continuance 1. As support, the Defendants claimed that "the defense

learned . . . that not a single member of the jury venire is Black." Mot. for Continuance

1. Notably, the juror information provided to the parties prior to trial did not identify

the juror's race or ethnicity, and, at a later telephone conference, counsel for the

Defendants admitted that their claim was merely an "educated assessment." Min.

Entry for Proceedings Held Before Judge Nancy Torresen (ECF No. 196).

The Government asserted no opposition (ECF No. 187), and I granted the

Defendants' motion to continue the trial and rescheduled the trial for May 3, 2022

(ECF Nos. 189 & 193). The Defendants sought discovery of the petit jury data on April

7, 2022. Mot. for Disc. of Petit Jury Data (ECF No. 195). Following a conference of

counsel on April 25, 2022, I ordered the Clerk of the Court to provide most of the

requested discovery and set a deadline of May 13, 2022, for any motions pertaining

to the jury selection process and any request for evidentiary hearing (ECF Nos. 196

---

[1]     Throughout the briefing on the jury challenge, Defendant Holland has joined in and adopted all motions made by Defendant Muller, and Defendant Muller has joined in at least one motion for a continuance filed by Defendant Holland.

& 197).[2] Because the Master Wheel currently in use was nearing its expiration date and would be last used in June of 2022, and because the Defendants intended to seek a continuance that would remove them from the June trial list, the Clerk's Office provided the jury data for the new master wheel that was in the process of being constructed. 2020 Master Wheel Jury Data for Bangor Division (ECF. No. 198).

On April 27, 2022, Defendants requested and received a continuance of trial until August 2, 2022 (ECF Nos. 199 & 200). Thereafter, the parties were provided with additional requested information and documents pertaining to the jury selection process, and several informational telephone conferences with the Clerk of Court and the District's Jury Administrator were held (ECF Nos. 203, 204, 206, 216, & 223). On June 24, 2022, an evidentiary hearing was held wherein the Defendants presented exhibits and obtained the testimony of the Jury Administrator (ECF Nos. 227, 228, & 229). After the evidentiary hearing, the Defendants sought and received additional discovery pertaining to historical jury selection data (ECF Nos. 230, 232, & 233).

On July 8, 2022, the Defendants filed the instant motion to dismiss the indictment or to change venue of the trial to the Southern District of New York. Def. Andre Muller's Mot. to Dismiss the Indictment or Alternatively, for a Change of Venue of the Trial to the Southern District of New York as his Challenge to the Jury Selection Revealed a Violation of his Sixth Amendment Rights ("**Jury Challenge Mot.**") 1 (ECF No. 237). The Defendants assert that the jury selection process violates

---

[2]      Criminal defendants mounting jury selection challenges have an "essentially . . . unqualified right" to access pertinent jury selection records. *United States v. Royal*, 100 F.3d 1019, 1025 (1st Cir. 1996) (quoting *Test v. United States*, 420 U.S. 28, 30 (1975)).

3

their rights under the Sixth Amendment, the Jury Selection and Service Act of 1968 (the "**JSSA**"), 28 U.S.C. §§ 1861 et. seq., and the equal protection component of the Fifth Amendment's Due Process Clause. Jury Challenge Mot. 1, 5–6.

## DISCUSSION

### I.    The Jury Selection Process in the District of Maine

The United States District Court for the District of Maine is presently operating under its Plan for the Random Selection of Grand and Petit Jurors for Service in the District of Maine, which went into effect on July 12, 2021. United States District Court for the District of Maine, Plan for the Random Selection of Grand and Petit Jurors for Service in the District of Maine as Amended June 17, 2021 ("**Jury Plan**"), available at https://www.med.uscourts.gov/sites/med/files/District_of_Maine_Jury_Plan.pdf.[3] Pursuant to the Jury Plan, the Clerk of the Court maintains one master jury wheel for the District of Maine and two qualified jury wheels, one in Portland and one in Bangor. Jury Plan at 2. Unless otherwise directed, the Clerk empties and refills the master jury wheel once every two years. Jury Plan at 2.

In order to build the jury wheels, the Clerk uses Blue Grass, an outside vendor, that gathers names from Maine's Central Voter Registration System and the lists of active licensed drivers and state identification card holders maintained by the Maine Bureau of Motor Vehicles ("**BMV**"). Evidentiary Hr'g Tr. at 8–10 (ECF No. 231); Jury

---

[3]     The District's Jury Plan was provided to the parties prior to the June 24, 2022, evidentiary hearing. *See* Ct. Ex. List (ECF No. 228).

Plan at 2.[4] The BMV excludes individuals who are deceased, who no longer reside in Maine, whose cards are expired, or who are under 18. Jury Plan at 2. Blue Grass then merges these source lists and removes duplicate names (that is, names found on more than one list), and provides the District with the master jury wheel. Evidentiary Hr'g Tr. at 8–9; Jury Plan at 2.

To build the qualified jury wheels, the Clerk uses the Jury Management System ("**JMS**"), an electronic data processing system, to randomly draw names from the master jury wheel to meet the needs of the Court for assignment to grand and petit jury panels in Bangor and Portland. Jury Plan at 4. JMS is programmed to ensure that every county in the state is proportionally represented. Jury Plan at 3. For the Bangor qualified wheel, names are drawn from Aroostook, Franklin, Hancock, Kennebec, Penobscot, Piscataquis, Somerset, Waldo, and Washington counties. Jury Plan at 3.

A juror qualification questionnaire (the "**Qualification Questionnaire**") is then sent to each person whose name is drawn, along with a letter from the Clerk of the Court instructing the prospective juror in the process. Jury Plan at 4; *see also* Sample Juror Qualification Questionnaire, United States District Court for the District of Maine, available at https://www.med.uscourts.gov/sites/med/files/Sample_Juror_Qualification_Questionnaire.pdf. The Qualification Questionnaire contains a

---

[4]     The prior master jury wheel drew names from only the voter rolls and drivers' license rolls. For juries selected after July 2022, a new master wheel drawing names from three source lists—voter rolls, drivers' license rolls, and state identification card holder rolls—was used.

number of questions corresponding to the exclusions contained in the JSSA.[5] The

Qualification Questionnaire also ask questions regarding race in order to allow the

collection of data that can ensure that jurors are being randomly selected from a fair

cross-section of the community and that no citizen is being discriminated against

under 28 U.S.C. § 1862.[6] The Clerk of the Court sends out Qualification

Questionnaires on a rolling basis, and those Qualification Questionnaires are

---

[5]     Section 1865 provides that an individual is deemed qualified "unless he—

> (1) is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;
>
> (2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;
>
> (3) is unable to speak the English language;
>
> (4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or
>
> (5) has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored."

28 U.S.C. § 1865(b).


[6]     A remark provided in explanation to the question on race on the Qualification Questionnaire states:

> Question 10 – RACE. Federal law requires you as a prospective juror to indicate your race. This answer is required solely to avoid discrimination in juror selection and has absolutely no bearing on qualifications for jury service. By answering this question you help the federal court check and observe the juror selection process so that discrimination cannot occur. In this way, the federal court can fulfill the policy of the United States, which is to provide jurors who are randomly selected from a fair cross section of the community.

Sample Juror Qualification Questionnaire, United States District Court for the District of Maine, available at https://www.med.uscourts.gov/sites/med/files/Sample_Juror_Qualification_ Questionnaire.pdf. Under 28 U.S.C. § 1862, "[n]o citizen shall be excluded from service as a grand or petit juror in the district courts of the United States . . . on account of race, color, religion, sex, national origin, or economic status." 28 U.S.C. § 1862.

continuously being received by the Clerk's office.[7] The Jury Administrator is required to utilize the data contained in the Qualification Questionnaires, as well as census data for the jurisdiction, to create Form AO-12. Evidentiary Hr'g Tr. at 20; *see also* Ct. Ex. List (ECF No. 228) (the Jury Administrator provided the parties with the most recent AO-12 in advance of the June 24, 2022 evidentiary hearing).

The Clerk processes the Qualified Questionnaires by removing any individuals who are excludable under 28 U.S.C. § 1866(c). Jury Plan at 6–7.[8] The Clerk then randomly draws from the qualified jury wheel "such numbers of names of persons as may be required for assignment to grand or petit jury pools." Jury Plan at 5.

Each person drawn for service is issued a summons to appear for jury selection. Plan at 5–6. In addition, jurors who receive a summons receive an additional questionnaire, inquiring into the prospective juror's age, place of residence, place of birth, length of residence in Maine, marital status, number of children, prior jury service, prior involvement in any court matter, connection to law enforcement, occupation, spouse's occupation, education, criminal history, fluency with English, and physical or mental conditions requiring accommodation (the "**Supplemental Questionnaire**"). These Supplemental Questionnaires are provided to counsel shortly before jury selection to help them determine their challenges for cause. The

---

[7]    The Clerk must follow the processes described in the Plan for dealing with Qualifying Questionnaires that are returned as undeliverable or not returned at all. Jury Plan at 4–5.

[8]    In addition to the exclusions noted at 28 U.S.C. § 1866(c), individuals in certain occupational classes are exempt from service, see Jury Plan at 7; 28 U.S.C. § 1863(b)(5), and individuals over the age of 75 can request to be excluded, Jury Plan at 7.

Supplemental Questionnaires contain no information regarding race. *See, e.g.*, Juror

Questionnaires (ECF Nos. 176 & 258).

## II.     Fair Cross-Section Challenge[9]

Under the Sixth Amendment of the United States Constitution, criminal

defendants are guaranteed a trial "by an impartial jury of the State and district

wherein the crime shall have been committed." U.S Const. am. VI. "The amendment

has been interpreted to guarantee a criminal defendant a jury 'drawn from a source

fairly representative of the community.' " *Anaya v. Hansen*, 781 F.2d 1, 3 (1st Cir.

1986) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)). The JSSA similarly

guarantees "juries selected at random from a fair cross section of the community," 28

U.S.C. § 1861, and "[t]he constitutional and the statutory requirement have been

construed as functional equivalents." *United States v. Hafen*, 726 F.2d 21, 23 n.1 (1st

Cir. 1984).

To establish a prima facie violation of the fair cross-section requirement, a

petitioner must show "(1) that the group alleged to be excluded is a 'distinctive' group

in the community; (2) that the representation of this group in venires from which

juries are selected is not fair and reasonable in relation to the number of such persons

in the community; and (3) that this underrepresentation is due to systematic

---

[9]      As the Government points out, the Defendants have failed to file a sworn statement of facts in support of the instant motion—a "strict prerequisite[ ] that Congress established for challenging juries alleged to have been selected in violation of the [Jury Selection and Service] Act." *United States v. Foxworth*, 599 F.2d 1, 3–4 (1st Cir. 1979); *see also* 28 U.S.C. § 1867(d). Despite the Defendants' failure to comply with the prerequisites of the Act, I will address the merits of the Defendants' argument.

exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979); *United States v. Royal*, 100 F.3d 1019, 1024 (1st Cir. 1996).

There is no question that the Defendants satisfy the first prong of the *Duren* test, as Black people are a "distinctive group" for the purpose of a jury composition challenge. *See Peters v. Kiff*, 407 U.S. 493, 498–99 (1972); *Anaya*, 781 F. 2d at 6.

Where the Defendants run into trouble is at the second prong, which asks whether the "representation of [the distinctive] group in venires from which juries are selected is . . . fair and reasonable in relation to the number of such persons in the community." *Duren*, 439 U.S. at 364. The Defendants' own data shows that the population of Division 1—the division from which the Bangor jury pool is drawn—is 0.7% Black. Jury Challenge Mot. 9. The First Circuit has held that, in cases where, as here, a very small portion of the population is Black, underrepresentation should be measured using the "absolute disparity" method. *See Hafen*, 726 F.2d at 24 ("[T]he comparative disparity calculation is ordinarily inappropriate where a very small proportion of the population is [B]lack and . . . in such a circumstance[ ] it distorts reality." (internal quotation marks omitted)).

"Absolute disparity in the jury selection context is defined as the difference between the percentage of a certain population group eligible for jury duty and the percentage of that group who actually appear in the venire." *Ramseur v. Beyer*, 983 F.2d 1215, 1231 (3d Cir. 1992). Here, to calculate absolute disparity, the percentage of individuals who identified themselves as Black on the Qualification Questionnaire (0.38%) is subtracted from the percentage of the population of Division 1 that is Black

9

(0.7%). *See* Jury Challenge Mot. 8. This calculation results in an absolute disparity of 0.32%, which, under *Hafen,* is insufficient to establish that Black people are underrepresented in the venires from which jurors are selected in Division 1. *See Hafen*, 726 F.2d at 23 (finding that an absolute disparity of 2.02% was not sufficient to show underrepresentation). In sum, the absolute disparity analysis does not support a finding that Black people are underrepresented in the jury selection process.

The Defendants' argument on the second *Duren* prong also fails because it is undeveloped and unsupported. The Defendants assert two bases for their underrepresentation argument. First, they state that "to the best of the defense's information and belief in analyzing the potential jury pool when this matter was set down for jury selection on April 5, 2022, there was not a single Black [person] in the venire." Jury Challenge Mot. 7. To support that claim, the Defendants cite only to their earlier motions to continue filed on April 2, 2022, where they made the same unsupported claim. Mot. for Continuance ("[T]he defense learned, on March 30, 2022, that not a single member of the jury venire is Black."); Def. Holland's Mot. to Join Def. Muller's Mot. to Continue Filed at ECF # 185. As I explained earlier, the Supplemental Questionnaires were published on the Electronic Court Filing system prior to trial, but they did not contain any data as to race or ethnicity, nor had other pertinent data been made available to counsel. *See* Juror Questionnaires (ECF No. 176). I questioned defense counsel Zelin about the basis for the claim, and he could provide no coherent explanation. To this day, despite being granted all the discovery

they sought, the defense has not provided the Court with any factual basis for this claim.

Second, the Defendants offer data purporting to demonstrate underrepresentation. Jury Challenge Mot. at 7–9. While the Defendants do offer numbers that are relevant to this determination, they provide no analysis. Jury Challenge Mot. at 7–9. When called out on this fact in the Government's Opposition, the Defendants conceded in their Reply that they did not perform either an absolute disparity or comparative disparity analysis. Def. Andre Muller's Reply to the Gov't's Resp. to Jury Challenge Mot. ("**Defs.' Reply**") 1 (ECF No. 243). As for the comparative disparity test, the defense states:

> The defense chose not to offer up a comparative disparity analysis, as it was surely to be met with the government's protestation that this test can be misleading, particularly where the distinctive group makes up a small percentage of the jury eligible population.

Defs.' Reply at 2. Essentially, the Defendants appear to have offered no analysis or argument because they understood that they lose under the absolute disparity test and that the comparative disparity test would distort the outcome. Because the Defendants do not bother to run the comparative disparity analysis, make no argument as to how the comparative disparity could be used here, and offer nothing to suggest that *Hafen* should not control here, I consider their argument on the second prong waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.")

For a jury challenge, each prong of the *Duren* test must be met. Since the Defendants' fair-cross-section challenge fails at the second prong, I need not reach the third prong. *See Hafen*, 726 F.2d at 24 (deciding case under *Duren*'s second prong and not reaching third prong).

### III.   Equal Protection

The Defendant also alleges that underrepresentation of Black people from Division 1's venire violates his equal protection rights under the Fifth Amendment. *See* Jury Challenge Mot. 1, 5–6. To show an equal protection violation in the context of jury selection, a defendant must (1) "establish that the group . . . is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied," (2) prove "the degree of underrepresentation . . . by comparing the proportion of the group in the total population to the proportion called to serve as . . . jurors, over a significant period of time," and (3) show discriminatory intent. *Castaneda v. Partida*, 430 U.S. 482, 494 (1977); *see also United States v. Hernandez-Estrada*, 749 F.3d 1154, 1166 (9th Cir. 2014).

Here, again, the Defendants provide raw data from recent history and claim consistent underrepresentation of Black people without analysis as to the degree of underrepresentation. Even if I assume, however, that the Defendants can meet the second prong—proving historical underrepresentation—there is no evidence of discriminatory intent. Indeed, the Defendants seem to concede that they do not believe the alleged underrepresentation of Black people from the jury selection process was intentional. *See* Jury Challenge Mot. 12 n.8 ("The defense is not suggesting that the underrepresentation of Blacks was intentional."). As the

Government points out, the District of Maine's Jury Plan is "designed to ensure a random selection of a fair-cross-section of the citizens residing in every county within the District of Maine," and states that the "selection of names for the master jury wheel shall ensure that every county within each jury subset is substantially proportionally representative." Gov't's Opp'n to Defs.' Mot. to Dismiss the Indictment or, Alternatively, for a Change of Venue of the Trial to the S. Dist. of New York ("**Gov't's Opp'n**") 8 (ECF No. 240). Further, the District draws names, not just from voter records, but also from drivers' license and state identification card rolls, in an effort to reach more Maine residents. The Defendants make no contention that the Jury Administrator has failed to follow the District's Jury Plan, nor do they present any other evidence of discriminatory intent. Thus, the equal protection challenge is denied.

## IV.    Change of Venue

Finally, I turn to the Defendants' request that venue be transferred to the Southern District of New York pursuant to Federal Rule of Criminal Procedure 21(a). Jury Challenge Mot. 13–15. "Venue change on grounds of prejudice will be deemed appropriate where there is an ever-prevalent risk that the level of prejudice permeating the trial setting is so dense that a defendant cannot possibly receive an impartial trial." *United States v. Quiles-Olivo*, 684 F.3d 177, 182 (1st Cir. 2012). "This prejudicial fog clouding a trial's fairness may be established where the facts show 'that jury prejudice should be *presumed*, and if prejudice should not be presumed, that the jury was *actually* prejudiced against the defendant.' " *Id.* (quoting *United States v. Rodríguez-Cardona*, 924 F.2d 1148, 1158 (1st Cir. 1991)).

In general, "[a] presumption of prejudice is reserved for those extreme cases where publicity is 'both extensive and sensational in nature.'" *United States v. Misla–Aldarondo*, 478 F.3d 52, 58 (1st Cir. 2007) (quoting *United States v. Angiulo,* 897 F.2d 1169, 1181 (1st Cir.1990)). This applies "in cases in which pervasive pretrial publicity has inflamed passions in the host community past the breaking point." *United States v. Walker*, 665 F.3d 212, 223 (1st Cir .2011). In this case, the Defendants do not allege that there has been any extensive pretrial publicity about this case in particular; rather, the Defendants argue that racist comments made by former Maine Governor Paul LePage will make the jury racially biased toward the Defendants, who are Black. *See* Jury Challenge Mot. 13.

This very same argument was already soundly rejected by this Court in *United States v. Crosby*, 1:17-cr-00123-JAW-1, 2018 WL 3431926 (D. Me. July 16, 2018). In that case, the defendant also claimed that racist comments by Governor LePage about out-of-state Black men supported his assertion of prejudice under Rule 21(a). *See id.* at \*6. Despite those comments, the Court rejected the defendant's request for a venue change because it was "unconvinced that the past race-based prejudicial comments attributed to the Governor of Maine render Mr. Crosby unable to obtain a fair trial." *Id.* at \*7.

For the same reasons, I reject the Defendants' instant motion to change venue under Rule 21(a). As in *Crosby*, the Defendants have made no effort to substantiate their claims that these remarks "have any current impact, let alone the drastic one required for transfer of venue—that [they] 'cannot possibly receive an impartial

14

trial.' " *Id.* at \*7 (quoting *Quiles-Olivo*, 684 F.3d at 182). Though the Defendants do state that former Governor LePage's comments "were widely reported" and "are still readily available on the internet," they do not provide any evidence—aside from the fact that former Governor LePage is again running for Governor—that those comments would have more of a prejudicial impact today than they would have in 2018, when *Crosby* was decided. Jury Challenge Mot. 13 n.9. As Judge Woodcock wrote in *Crosby,* "[v]oir dire is a cardinal pillar of our jury selection process designed to select petit jurors who are open-minded and unbiased." *Crosby*, 2018 WL 3431926, at \*7. Counsel will be given ample opportunity in voir dire to select a fair-minded jury. The motion to change venue is denied.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendants' motion to dismiss the indictment or change the venue of the trial.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 26th day of July, 2022.