## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )    Docket No. 1:19-cr-00109-NT |
| | ) |
| ANDRE MULLER and | ) |
| ROBERT HOLLAND, | ) |
| | ) |
| Defendants. | ) |

## AMENDED[1] ORDER ON THE DEFENDANTS' MOTION FOR A NEW TRIAL

Before me is Defendant Andre Muller's motion for a new trial (ECF Nos. 315),[2] which is joined by Defendant Robert Holland. For the reasons stated below, the motion is **GRANTED**.[3]

## BACKGROUND

### I.   The Jury Selection Challenge

Mr. Muller and Mr. Holland were charged with conspiracy to interfere with commerce by robbery, a violation of the Hobbs Act, 18 U.S.C. § 1951(a). *See*

---

[1]    The Court's Order dated November 2, 2022 is amended to clarify that only the Defendants' motion for a new trial has been granted, not the Defendants' purported motion for dismissal of the indictment. *See* footnote 2 and accompanying text. I have also included the Court's intentions as to the sealing of certain documents at the end of this Amended Order.

[2]    The Defendants' supplemental motion styles itself as a motion for a new trial *and* a motion to dismiss the indictment (ECF No. 326), but the motion itself makes no argument as to dismissal of the indictment. I note that the cursory invocation of this argument is insufficient. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Id.* This argument is forfeited due to a failure to develop it, and to the extent the Defendants' supplemental motion requests dismissal of the indictment, that motion is **DENIED**.

[3]    Because the Defendants have prevailed on their motion for a new trial, their request to file a late reply (ECF No. 346) is **DENIED** as moot.

Indictment (ECF No. 3). A trial was originally scheduled to start in April of 2022, in Bangor, Maine, but the trial date was continued after the Defendants, citing concerns about the racial makeup of the jury venire, filed motions to continue. Def. Andre Muller's Mot. for a Continuance of the Trial so that He May Challenge the Jury Selection Process as in Violation of his Sixth Amendment Rights, his Right to Due Process, his Right to Equal Protection and in Violation of the Jury Selection and Service Act of 1968 (ECF No. 185); Def. Holland's Mot. to Join Def. Muller's Mot. to Continue Filed at ECF # 185 (ECF No. 186); *see also* Oral Order Granting Mot. to Continue (ECF No. 189). On July 8, 2022, after months of discovery into the District of Maine's jury selection process, the Defendants filed a motion to dismiss the indictment or change venue to the Southern District of New York. Def. Andre Muller's Mot. to Dismiss the Indictment or Alternatively, for a Change of Venue of the Trial to the Southern District of New York as his Challenge to the Jury Selection Revealed a Violation of his Sixth Amendment Rights 1 (ECF No. 237). Finding no constitutional or statutory fault in the jury selection process or the trial's venue, I denied the Defendants' motion. Oral Order Denying Mot. to Dismiss and Mot. for Change of Venue (ECF No. 248). In doing so, however, I emphasized that counsel would have "ample opportunity in voir dire to select a fair-minded jury." Order on Def. Andre Muller's Mot. to Dismiss the Indictment or for a Change of Venue 15 (ECF No. 267). Trial was thus rescheduled for August of 2022 in Bangor (ECF No. 224).

## II.    The Trial

Jury selection began in the morning on August 2, 2022 and lasted the full day. Minute Entry (ECF No. 283). The selection process included both a case-specific

written juror questionnaire and oral voir dire. Among other things, the written questionnaire—agreed to by the parties and distributed before voir dire—informed the potential jurors that the Defendants in the case were Black and that other individuals involved in the case were people of color. Written Juror Questionnaire (ECF No. 285). The questionnaire then posed the following yes/no questions, which were designed to ascertain racial prejudice on the part of the respondent:

- Have you ever made complaints about a person, or referred to a person in a derogatory way, based on that person's race or national origin?

- Do you think African-Americans are more likely to commit crime, be involved in violent crimes, and/or be involved in drug dealing?

- Have you or any of your close friends or immediate family ever been the victim of a crime committed by a person of a different race or ethnic group such that the experience would prevent you from serving as a fair and impartial juror in this case?

- Would the fact that the Defendants and one or more of the witnesses are from out of state prevent you from being a fair and impartial juror in this case?

- Would the fact that the Defendants and one or more of the witnesses are persons of color affect your determination as to whether the Defendants are guilty, and/or prevent you from serving as a fair and impartial juror in this case?

- Would the fact that the Defendants are African-American prevent you from serving as a fair and impartial juror in this case?

Written Juror Questionnaire 2–3. Each juror was required to sign the written questionnaire and "affirm, under penalty of perjury, that I have given the complete and honest answers to all of the above questions." Written Juror Questionnaire 3. Several potential jurors were dismissed for cause after responding "yes" to one or more of these questions.

Next came voir dire, during which time I, with input from counsel, asked further questions of the potential jurors under oath. These questions, like those included in the written questionnaire, were meant to reveal any explicit or implicit biases that could affect the fair judgment of the jurors. A number of jurors were dismissed for cause based on their answers to these questions.

At the conclusion of the selection process, I seated a jury of twelve members with four alternates. The trial began the next day, on August 3, 2022, and the evidence concluded on August 9, 2022. Minute Entry ("**Aug. 9 Minute Entry**") 1 (ECF No. 288). At the close of evidence, I dismissed the remaining alternate jurors and thanked them for their service. At 2:00 p.m. on August 9, 2022, following a brief break during which the alternate jurors left the courthouse, I committed the case to the jury for deliberation. Aug. 9 Minute Entry.

III.   **Juror 13's Text Message**

Just a few minutes after deliberation began, at 2:10 p.m., the jury administrator received a text message from one of the alternate jurors who had been

4

dismissed. The sender was later identified as Juror 13,[4] who had been the only Black member of the jury. The message said:

> Just wanted to let you know that if the jury comes back really quick with a guilty verdict then they stuck to the plan they said they were going to do. I was really one of the only ones who was going to fight it and try to make it fair but since my voice won't be heard then I thought I would let you know there were a couple who was still a little undecided but if I was in those boys shoes I would feel ultimately screwed[.]

Sealed Additional Attachs. Suppl. Mot. for New Trial Ct. Ex. 1—Text ("**Juror 13 Text**") (ECF No. 316-2). Juror 13 then sent a follow-up message: "Not saying that's what's going to happen!! but it was suggested!!" Juror 13 Text.

Upon learning from the jury administrator what had occurred, I immediately called a conference of counsel at which I shared Juror 13's messages and asked counsel how they would like to proceed. Sealed Tr. of Proceedings ("**Tr. of Aug. 9 Conf. of Counsel**") 2:1–3:14 (ECF No. 335). All parties agreed that the text messages warranted further investigation, but there was disagreement among the Defendants about whether to disrupt jury deliberations. *See* Tr. of Aug. 9 Conf. of Counsel 3:15–6:13, 11:12–12:7, 20:14–21:14, 24:20–24:25, 26:17–27:11. Defendant Muller asked for a mistrial or to suspend jury deliberations, but Defendant Holland did not want me to declare a mistrial or suspend deliberations.[5] *See* Tr. of Aug. 9 Conf. of Counsel

---

[4]     To protect their privacy, I refer to all jurors by the juror number assigned to them at trial.

[5]     In their motion for a new trial, the Defendants assert that they made "twin requests for suspension of jury deliberations" after they were informed of Juror 13's text message. Def. Andre Muller's Mot. for a New Trial Pursuant to Fed. R. Cr. P. Rule 33 (Suppl.) and Mot. to Dismiss Indictment ("**Mot. for New Trial**") 12 (ECF No. 326). As clearly demonstrated by the transcript of the conference of counsel, this is not true. Defendant Muller's counsel asked to suspend deliberations while Defendant Holland's counsel asked that deliberations continue.

11:12–12:7, 19:15–20:25, 25:20–25:24, 26:17–27:11. Ultimately, taking into account input from counsel, I decided not to disrupt jury deliberations. *See* Tr. of Aug. 9 Conf. of Counsel 25:25–26:4. I stated, however, that in the event of a guilty verdict, that I would interview Juror 13 to determine whether there was a credible allegation of juror misconduct. *See* Tr. of Aug. 9 Conf. of Counsel 27:16–28:2. The jury returned a guilty verdict as to both Defendants later that evening, after over four hours of deliberations. Jury Verdict Form (ECF No. 291); Aug. 9 Minute Entry (stating that the jury returned a verdict at 6:20 p.m.).

Upon my instruction, the jury administrator sought to get in touch with Juror 13 through various channels—including phone calls, text messages, and an email— throughout the evening of August 9th and the morning of August 10th, but all such attempts were unsuccessful. *See* Sealed Tr. of Proceedings ("**Tr. of Aug. 10 Tel. Conf. of Counsel**") 4:2–5:12 (ECF No. 336). Unable to contact Juror 13 through any other means, the jury administrator drove with a Deputy United States Marshal to Juror 13's house to notify her of the Court's desire to meet with her. Sealed Tr. of Proceedings ("**Tr. of Aug. 11 Tel. Conf. of Counsel**") 2:23–3:5 (ECF No. 337). Juror 13 was at her home when the jury administrator and Deputy United States Marshal arrived, and she indicated that she had not received the calls or messages from the jury administrator and agreed to come back to the courthouse to speak with me. Tr. of Aug. 11 Tel. Conf. of Counsel 3:2–3:21.

## IV.   Interview with Juror 13

The parties had previously agreed that I should speak to the juror without presence of counsel or the Defendants,[6] Tr. of Aug. 9 Conf. of Counsel 9:21–10:11, 12:1–12:6, Tr. of Aug. 10 Tel. Conf. of Counsel 13:20–14:19, and so I conducted an interview with Juror 13 in camera but on the record on August 10, 2022.[7] During the interview, I asked Juror 13 to describe the things she saw or heard that led her to send a text to the jury administrator. Sealed Additional Attachs. Suppl. Mot. for New Trial Attach. No. 1 8/10/2022 Sealed Hearing Tr. ("**Tr. of Juror 13 Interview**") 3:14–3:16 (ECF No. 316-1). Juror 13 stated that she heard other jurors make the following remarks over the course of the trial, prior to deliberation:

Made up her mind and playing with hair: A juror—later identified as Juror 128[8]—stated that she "made up her mind when she got the notice in the mail." Tr. of Juror 13 Interview 3:17–3:19. Juror 13 also heard Juror 128 say, "[L]ooking at her hair was more interesting than listening to [Defendant Muller's Attorney]." Tr. of Juror 13 Interview 3:21–3:23.

---

[6]    Counsel for Defendant Muller suggested that, because Juror 13 might be "less . . . anxious" and thus more forthcoming speaking "one-on-one with the Court and the court reporter," that I should "meet one-on-one, in camera, with the alternate on the record." Tr. of Proceedings ("**Tr. of Aug. 9 Conf. of Counsel**") 10:4–10:11, 12:2–12:3 (ECF No. 335).

[7]    I arranged for Juror 13 to speak with a public defender before our interview so she could understand the process. Sealed Tr. of Proceedings ("**Tr. of Aug. 11 Tel. Conf. of Counsel**") 4:1–4:8 (ECF No. 337); Sealed Additional Attachs. Suppl. Mot. for New Trial Attach. No. 1 8/10/2022 Sealed Hearing Tr. ("**Tr. of Juror 13 Interview**") 2:25–3:10 (ECF No. 316-1).

[8]    Juror 13 described the individuals involved in these incidents by where they sat in the jury room and courtroom, their physical appearance, occupation, and/or other identifying characteristics. With the assistance of the jury administrator, I was able to match those descriptions to jurors.

<u>Delivering verdict from the back row to hide</u>: A juror—who I was not able to identify–stated: "[W]hen we deliver the [verdict], it should be somebody that's in the back, that way they can hide." Tr. of Juror 13 Interview 13:17–13:19.

<u>No defense witnesses so it should be quick</u>: A juror—later identified as Juror 33–was heard explaining to others that "[o]nce [the prosecution] wrap[s] up, it's the defense's turn," but that "he didn't see the defense calling any witnesses, so it should be quick." Tr. of Juror 13 Interview 19:2–19:4.

<u>Setting a record and stalling for a free meal</u>: Juror 13 heard other jurors, who were never identified, make a number of additional comments about the length of deliberations, including joking that the jurors could set a "record" for "the fastest jury, in and out," and questioning whether, if it was a short deliberation, they should postpone to get a free meal. Tr. of Juror 13 Interview 16:19–16:21, 23:1–23:5.

<u>No offense, but the Defendants just look guilty</u>: A juror—later identified as Juror 22—turned to Juror 13 in the jury room and said, "No offense by what I'm about to say, but the [Defendants] just look guilty." Tr. of Juror 13 Interview 6:23–6:25.

During the course of the interview, Juror 13 clarified that when she texted the jury administrator, she did not mean to imply that there was a formal plan among jurors to pre-decide the outcome of the case. Tr. of Juror 13 Interview 21:23. She explained, however, that the aforementioned comments had struck her as "[s]tuff that should not have been said" and indicated that "a lot" of the jurors weren't "taking it as serious . . . as it needed to be taken." Tr. of Juror 13 Interview 24:2–24:3, 29:18–29:19.

8

I spoke with counsel by phone the next day, on August 11, 2022, after counsel had time to review the transcript of my interview with Juror 13. *See* Tr. of Aug. 11 Tel. Conf. of Counsel. All agreed that Juror 13's allegations raised the possibility of juror misconduct and warranted further investigation. Tr. of Aug. 11 Tel. Conf. of Counsel 5:24–6:3, 7:13–8:13, 9:20–11:4. After consulting with counsel, I asked the jury administrator to arrange interviews with the jurors who might have said and/or overheard the comments alleged by Juror 13. Tr. of Aug. 11 Tel. Conf. of Counsel 13:14–20:4.

## V.    Subsequent Juror Interviews

Over the course of the next week, I interviewed eight jurors who had served alongside Juror 13. Once again, as agreed to by the parties, the interviews were conducted in camera and on the record and without counsel present. I asked the interviewees an assortment of questions submitted by counsel as well as additional questions I believed to be appropriate based on the direction of conversation.

In these interviews, almost every one of Juror 13's allegations were corroborated, at least in part:

Made up her mind and playing with hair: Juror 128 denied that she had said that she had made up her mind when she got the jury notice in the mail. Gov't's Resp. to Def. Andre Muller's Mot. for a New Trial Ex. 5—Sealed Tr. of 8/17/2022 Hr'g ("**Tr. of Day 2 Juror Interviews**") 4:3–4:13 (ECF No. 344-7). I credit Juror 128's recollection over Juror 13's because I found Juror 128's denial credible, and, unlike almost all of Juror's 13's other allegations, no other juror I interviewed corroborated the statement. Juror 128 did, however, admit that she had made a comment about

9

playing with her hair. Tr. of Day 2 Juror Interviews 5:1–5:3. Several other jurors confirmed hearing Juror 128 make a statement about playing with her hair. Gov't's Resp. to Def. Andre Muller's Mot. for a New Trial Ex. 4—Sealed Tr. of 8/12/2022 Hr'g ("**Tr. of Day 1 Juror Interviews**") 28:13–28:18, 41:13–41:16 (ECF No. 344-6). Juror 128 went on to say that she played with her hair during the trial because "I have to fidget in order to concentrate," and she credibly maintained that she had listened to the evidence and had based her verdict solely on the evidence. Tr. of Day 2 Juror Interviews 5:6–5:16.

<u>Delivering verdict from the back row to hide</u>: Although no one remembered precisely who said it, four of the jurors interviewed confirmed that they heard someone make this comment prior to deliberations. Tr. of Day 1 Juror Interviews 29:12–30:1; Tr. of Day 2 Juror Interviews 6:1–6:19, 18:3–18:12, 26:14–27:3. At least one juror who heard this comment understood it to be a joke. Tr. of Day 1 Juror Interviews 29:12–29:19.

<u>No defense witnesses so it should be quick</u>: Juror 33 admitted that he made a comment like this, but stated that, because he is a lawyer and has knowledge of how trials operate, he was merely trying to explain the process to fellow jurors. Tr. of Day 1 Juror Interviews 48:2–48:7. Two other jurors similarly remembered that Juror 33 made a comment like this in the context of explaining the trial process. Tr. of Day 1 Juror Interviews 61:9–62:17; Tr. of Day 2 Juror Interviews 7:14–8:1. One juror specifically remembered that, during this conversation in which the trial process was discussed, Juror 33 explained to his fellow jurors that the Defendants were not

required to testify in their own defense and that "[i]t's not their job to prove their innocence . . . it's the government's job to prove guilt." Tr. of Day 2 Juror Interviews 7:20–7:25.

Setting a record and stalling for a free meal: None of the jurors I interviewed recalled anyone making a statement about setting a record for fastest deliberation, but two jurors did recall someone joking that the longer deliberations lasted, the longer they would not have to return to work. Tr. of Day 1 Juror Interviews 30:6–30:13; 47:7–47:14.

No offense, but the Defendants just look guilty: Juror 22 maintained that she did not recall making this comment, Tr. of Day 1 Juror Interviews 8:10–10:14, but several details lead me to favor Juror 13's recollection.

When I first started discussing the statement, I did not indicate that Juror 22 was the juror identified as having made the statement. I stated that there had been "a suggestion that someone said" to the Black juror: "No offense. I don't mean to be rude, but they just look guilty." Tr. of Day 1 Juror Interviews 6:21–7:8. Without hesitation, Juror 22 responded:

> But that doesn't have to do with race. Honestly, we were, at the very beginning here, when we were first here, we were laughing about it. We're like, you know, honestly, most of the people we know that are drug dealers are white . . . . You know, for us, the race has nothing to do with it. But the way that they were sitting and all, they looked a little bit pulled together, you know what I mean? . . . They were . . . very well dressed. . . . [T]hey looked a little too confident. I mean, if I had been there, even innocent, I would have been worried, even had I been innocent. And I personally didn't think they looked guilty or anything, but I can see where that would have come from because, especially, up here in Maine, most of us are a little rustic. I think that's the best way to put it. We're just not used to seeing . . . people that can pull themselves

11

together like that. Most people, you know, they still are a little bit [ ] not a hundred percent looking like they came out of a magazine, you know. I think that maybe that was why. I hadn't personally heard anybody say they look guilty, but I can see where it came from.

Tr. of Day 1 Juror Interviews 7:9–8:9.

I then asked: "If someone had said that you said, 'No offense, but they look guilty,' what would be your reaction to that?" Tr. of Day 1 Juror Interviews 8:10–8:12. Juror 22 denied that she would ever use the words "no offense" because "that sounds rather accusatory towards whoever I'm speaking to"—in this case, the only Black person in the room. Tr. of Day 1 Juror Interviews 8:14–8:16. But Juror 22 also admitted that "it's entirely possible, in some caffeinated state that I was in, I might have said something" to that effect. Tr. of Day 1 Juror Interviews 9:22–9:23. She later elaborated:

> I have a little problem with caffeine. It makes me a Chatty Cathy, and it makes me a bit more aggressive in my demeanor. I'm also not naturally a morning person, so I do tend to be more chatty and stuff.[9]

Tr. of Day 1 Juror Interviews 16:11–16:15. To explain her memory lapses, Juror 22 also candidly admitted that she had a tendency to "brain dump."[10] Tr. of Day 1 Juror Interviews 4:9–4:10, 5:10–5:16. In contrast, Juror 13's memory was clear that the words "no offense" were spoken, and she offered an explanation for why it sunk in: "I've heard that a lot. . . . It just took me out the way a little bit." Tr. of Juror 13

---

[9]    Juror 13 stated that the conversation was prompted by a situation where she and Juror 22 had arrived one morning at the courthouse security station at the same time as one of the Defendants. Tr. of Juror 13 Interview 6:23–8:2. Juror 13 recalled that Juror 22 made the statement after they got to the jury room and were discussing the awkwardness of the situation. Tr. of Juror 13 Interview 10:9–11:3.

[10]    While she did not define "brain dump," Juror 22 stated that she learned the practice in the Army. I took it to mean that she empties her brain of information to make space for more things.

Interview 11:2–11:5. Although no other juror overheard the entire exchange between Juror 13 and Juror 22, one juror specifically remembered hearing the words "no offense" coming from a juror seated in the jury room where Juror 22 and Juror 13 would have been. Tr. of Day 2 Juror Interviews 23:13–24:6, 25:7–26:10, 29:9–30:9. Taken together, these facts support a finding by a heavy preponderance that Juror 22 made this comment to Juror 13.

## VI.   Motion for a New Trial

On August 18, 2022, the Defendants timely filed a motion for a new trial. Def. Andre Muller's Mot. for a New Trial Pursuant to Fed. R. Cr. P. 33 (ECF No. 315). The following day, on August 19th, I held a conference of counsel at which I explained that transcripts of my interviews with the jurors would be available later that day. Sealed Tr. of Proceedings (ECF No. 338). Because the Defendants moved for a new trial before having access to the transcripts, I set a briefing schedule to allow the Defendants time to supplement their initial motions. The Defendants filed their supplemental motion on August 31, 2022. Def. Andre Muller's Mot. for a New Trial Pursuant to Fed. R. Cr. P. Rule 33 (Suppl.) and Mot. to Dismiss Indictment ("**Mot. for a New Trial**") (ECF No. 326).

## DISCUSSION

The Defendants ask for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Under Rule 33, a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "Motions for a new trial are directed to the broad discretion of the trial judge, who may weigh the

evidence and evaluate the credibility of witnesses in considering such a motion." *United States v. Wilkerson*, 251 F.3d 273, 278 (1st Cir. 2001) (quoting *United States v. Indelicato*, 611 F.2d 376, 387 (1st Cir. 1979)). "However, 'the remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict.' " *Id.* (quoting *Indelicato*, 611 F.2d at 387).

The Defendants contend that they are entitled to a new trial because they were denied their Sixth Amendment right to a fair trial.[11] Mot. for a New Trial 10. The Sixth Amendment of the United States Constitution guarantees every defendant in a federal criminal trial the right to an "impartial jury." U.S. Const. amend. VI. The right to an impartial jury is a structural right, and a violation of that right is a structural error that "requires that a verdict be vacated and a new trial granted, without analysis of whether the error can be treated as harmless." *United States v. Fuentes*, Criminal No. 2:12–CR–50–DBH, 2013 WL 4483062, at *7 (D. Me. Aug. 19, 2013).

"An impartial jury is one 'capable and willing to decide the case solely on the evidence before it.' " *Sampson v. United States*, 724 F.3d 150, 163 (1st Cir. 2013) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)). Evidence that a juror was biased and/or that he or she prejudged the case can support

---

[11]    The Defendants also assert that the procedure I followed in conducting my investigation of jury taint was plagued by several shortcomings. *See* Def. Andre Muller's Mot. for a New Trial Pursuant to Fed. R. Cr. P. Rule 33 (Suppl.) and Mot. to Dismiss Indictment ("**Mot. for a New Trial**") 12–19 (ECF No. 326). Because I ultimately find that there is a sufficient basis to grant a new trial, I do not reach the Defendants' process-based arguments.

a finding that the jury was not impartial. *See United States v. Villar*, 586 F.3d 76, 84 (1st Cir. 2009) ("The obvious difficulty with prejudice in a judicial context is that it prevents the impartial decision-making that both the Sixth Amendment and fundamental fair play require." (quoting *United States v. Heller*, 785 F.2d 1524, 1527 (11th Cir. 1986))). However, "[n]ot every juror misstatement during a trial necessarily invalidates a verdict." *Fuentes*, 2013 WL 4483062, at *5. "Given human frailty, a juror might make an inappropriate ethnic statement . . . , yet later regret it and conscientiously set aside any prejudice in deliberations and assess the evidence with his colleagues, without bias." *Id.*

The issue here is whether the statements[12] reported by Juror 13 establish juror bias and/or prejudgment such that a new trial is appropriate. For the most part, the statements that I found were made by various jurors do not support a finding of prejudice or prejudgment. For example, although Juror 128 admitted that she told the other jurors she was playing with her hair during trial, I found her credible when

---

[12]    I note that Federal Rule of Evidence 606(b)(1) could be read to prohibit me from inquiring into statements made by jurors during deliberations, and even preceding deliberations. Fed. R. Evid. 606(b)(1) ("During an inquiry into the validity of a verdict . . . a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict . . . . The court may not receive a juror's affidavit or evidence of a juror's statement on these matters."); *see also* 27 Charles Alan Wright et al., *Federal Practice and Procedure* § 6074 n. 20.1 and accompanying text (2d ed. 2013) ("[S]o long as a verdict . . . . has been reached, Rule 606(b) applies even where the evidence offered relates to events that preceded the verdict . . . ."). The First Circuit, however, has clarified (in the context of statements made *during* deliberations, no less) that the right to an impartial jury trumps the rule shielding juror deliberations from scrutiny. *United States v. Villar*, 586 F.3d 76, 87 (1st Cir. 2009) ("While the issue is difficult and close, we believe that the rule against juror impeachment cannot be applied so inflexibly as to bar juror testimony in those rare and grave cases where claims of racial or ethnic bias during jury deliberations implicate a defendant's right to due process and an impartial jury."). As such, I conclude that consideration of juror statements is appropriate in the context of this motion.

she maintained that she still listened to the evidence and made her final decision based on that evidence. And, although Juror 13 recalled Juror 128 saying that she had made up her mind when she got the notice in the mail, Juror 128 credibly denied that she had made that statement.[13] Additionally, the comment that the jurors should stall deliberations were made in jest and do not appear to have prejudiced the Defendants in any way.

Juror 22's comment—"No offense, but the Defendants just look guilty"—is a different matter. As discussed above, I find by a heavy preponderance that Juror 22 did make this statement before I committed the case to the jury for their deliberations. The statement is problematic for two reasons. First, it shows racial bias. Although the Government argues that the remark is not indicative of racial bias, context is everything. Juror 22 made the statement that she thought the Defendants looked guilty prefaced by the words "no offense" to the only Black juror. The racial bias may not be in the words, but it is in the context.[14] And Juror 22's attempt to explain why the statement had nothing to do with race by pointing to purportedly

---

[13] This is not to say that I believe Juror 13 lied. But Juror 13 could have misinterpreted some comments from her fellow jurors or read into them things that were not there. For example, Juror 13 remembered Juror 33 commenting that the Defendants would probably not put on a case. Juror 33, a lawyer, clarified that he said that the Defendants were not required to put on any evidence. Other jurors corroborated Juror 33, but it is easy to see how Juror 13 could have misinterpreted the remark.

[14] Juror 22 may have genuinely believed that she had no race-based bias against the Defendants. She made that point during her interview. But she may have been unaware of her own biases. Because she would not admit that she made the statement, or at least not in the context that made it racially charged, I was unable to inquire into whether she was able to set any bias aside in reaching her verdict.

16

race-neutral characteristics on which she had judged the Defendants' appearance struck me as a post-hoc, racially tinged justification.[15]

Second, the fact that Juror 22 voiced an opinion about the guilt of the Defendants in the jury room prior to deliberations suggests to me that she made premature judgments about the case.[16] I reminded the jury numerous times during the trial, that they were to reserve judgment on the guilt or innocence of the Defendants until the close of evidence and that they were forbidden from discussing the case amongst themselves prior to deliberations.

In sum, I find that "these defendants did not have a jury of twelve people all prepared to deliberate impartially on their guilt or innocence." *Fuentes*, 2013 WL 4483062, at *6. Juror 22's comment demonstrates that she decided the Defendants' guilt early in the trial without waiting for all the evidence and that her decision was informed by racial stereotyping. As such, the Defendants' motion for a new trial is granted.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Defendants' motion for a new trial.

---

[15]    Juror 22 explained that she thought the Defendants looked guilty because they appeared too "pulled together," in contrast to the "rustic" appearance most Mainers are used to. Tr. of Day 1 Juror Interviews 7:14–8:1. At trial, the Defendants' sartorial choices were unremarkable—they both wore suits, as is customary for criminal defendants, even in Maine.

[16]    I am also troubled by the comment that the person who delivers the verdict should sit in back. Although some jurors suggested that the comment was made in jest, the comment implicitly suggested that the jury would be returning guilty verdicts. While alone the comment may not be sufficient to warrant a new trial, here it adds some weight to the claim that some jurors may have made up their minds before all the evidence was in.

The Court intends to unseal this order, the Defendants' motion for a new trial and supplemental briefing, and the Government's response. The Court intends to leave the exhibits to those filings sealed. Any objections to the unsealing of any of these documents should be filed within 7 days. If no objection is filed within 7 days, this order, the motion for a new trial, and related briefing will all be unsealed.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 3rd day of November, 2022.